WILLIS STONE, Respondent, v. V. W. JOHNSTON, Appellant.

Kansas City Court of Appeals, December 9, 1912.

ARBITRATION AND AWARD: Fraud of Referee. An award may be impeached and avoided by proof of fraud provided it be fraud practiced by the referees, but where the party claiming fraud on the part of a referee, ratifies and adopts the award after he discovers the fraud, he cannot thereafter complain of the award.

Appeal from Chariton Circuit Court.—*Hon. S. J. Jones,* Special Judge.

REVERSED.

*Bresnehen & West* for appellant.

*J. A. Collet* and *Jno. D. Taylor* for respondent.

JOHNSON, J.—This is an action to recover damages resulting from the alleged breach by defendant of a contract of employment. Defendant, a banker in Champaign, Illinois, owned a farm of nine hundred acres in Chariton county, Missouri, most of which lay in the Chariton river valley. Under date of February 8, 1910, he entered into a contract in writing with plaintiff, who was living in Illinois, by the terms of which he employed plaintiff for a term ending March 1, 1911, to move with his family to the farm and to do work upon it as defendant, from time to time, should direct. Some of the land had been cultivated, much of the bottom land had not been broken for cultivation and a drainage system of some magnitude was being constructed for the benefit of this and adjoining farms in the valley. The contract contemplated that the services of plaintiff would be employed in planting and cultivating crops, in plowing unbroken land and in working on the drainage ditch, and fixed the compensation plaintiff was to receive for these different kinds of work. For example, he was to be paid one dollar and seventy-five cents per acre for plowing unbroken land, one dollars and twenty-five cents per acre for plowing land that had been cultivated, twenty cents per acre for planting crops, fifty cents per acre for cultivating crops and thirty-five cents per hour for each man and team "working on the levee." It was provided that plaintiff should move his family to the farm and should take with him a full set of farming implements and "at least nine head of good horses and mules." He was to have the use free of charge of the house, barn, outbuildings and "a truck patch" and was "to pay the usual price for the pasture land used by him and also pay the usual rental for all land farmed by him on the shares."

Further the contract provided that defendant would "instruct second party (plaintiff) as to how he desires said land farmed and crop tended" and that

"when not practicable to work on the crops second party is to be furnished levee work, ditching, bridge building and other farm work which is to be paid for at the usual and customary rate, it being understood that first party (defendant) is to advise second party from time to time as to the work he desires done and method of doing same."

In plaintiff's family were two sons almost grown who had been working for their father as farm hands and we think the contract as a whole expressed the mutual intention that plaintiff should take with him sufficient equipment for the proper employment of himself and his sons and that defendant should keep this force reasonably employed during the term of the contract at the rates of compensation therein stated.

Plaintiff and his family moved to the farm and he brought with him ten head of horses and mules and the equipment mentioned in the contract. He was ready to begin work March 15, 1910, but was compelled to remain idle a week because of defendant's failure to give working orders. Defendant visited the farm March 22d and gave directions concerning the work to be done and then returned to Champaign. Some of the work laid out by defendant could not be done on account of unfavorable weather and the remainder was not sufficient to keep the force busy. The evidence of plaintiff tends to show that the disagreement which ensued between the parties, very shortly after their relation began, was caused by the neglect of defendant to give adequate working orders while the evidence of defendant is to the effect that such orders were given and plaintiff failed to obey them. This disagreement which related to the question of the amount due plaintiff under the contract became so acute that plaintiff went to Champaign early in May to effect a settlement if possible. A conference there between the parties resulted in an oral agreement to submit the matters in dispute to arbitration and three

arbitrators were chosen. One of them was an associate of defendant in the banking business in Champaign and another (F. H. Jones) owned a farm adjoining that of defendant in Chariton county and was interested in the drainage project by which the farms in that neighborhood were to be benefited. The evidence of plaintiff shows he had knowledge of the business connection between the first mentioned arbitrator and defendant, but had no knowledge that Mr. Jones was directly interested in the subject-matter of the arbitration. On May 11, 1910, the arbitrators made the following award in writing:

"We, the undersigned, have agreed as arbitrators of the contract of February 8, 1910, between V. W. Johnston and Willis Stone, shall be null and void and of no effect.

"It is further agreed that Willis Stone shall be allowed eighteen dollars ($18) for work done May 2, 3, 4, 5 and 6, 1910, forty dollars ($40) for work done on Elm creek cut-off and the sum of sixty-seven and 65/100 dollars ($67.65) a total of one hundred twenty-five and 65/100 dollars ($125.65), being the amount due up to date. Further, said Stone shall be allowed $1.25 per acre for all plowing up to this date, in addition to the above, less $50, which has been paid said Stone.

"It is further agreed that said Stone shall be paid the sum of two hundred seventy-five dollars ($275) per month for the service of himself, two boys, ten horses, and his implements for the first five months from this date. Further, said Stone shall receive fifty-nine dollars ($59) per month for the remaining time to the first of March, 1911, for himself, ten horses and implements.

"The pasture fifteen or twenty acres near barn, there shall be no charge for."

This award was submitted to both parties, was accepted by them and they gave formal expression to

their acceptance by signing the award. Plaintiff returned to the farm and worked one month under the new agreement. The arbitration did not result in restoring harmony between the parties. During that month the correspondence conducted by them became somewhat acrimonious. In a letter written by plaintiff May 25, 1910, he said ''the way you wrote your last letter does not sound good to anyone. I am not worried about your holding my money as I am here with everything that I agreed to bring and can collect for my time. It is hard labor and I think a man ought to pay for it. Mr. Johnston, I think you had better investigate that arbitration contract and see if it will hold good with two parties interested as Jones and Goodman were to you.''

Before the end of the first month plaintiff employed a lawyer who telegraphed defendant that a settlement must be made at the end of the month. Defendant came to Chariton county in response to the telegram and refused plaintiff's demand for $275, a full month's pay under the new contract. The parties then entered into a written contract for a second arbitration in which they agreed that the new contract of May 11, 1910, should be taken as a basis and that the award of the arbitrators, in addition to assessing the amount due plaintiff for his services from May 11 to June 11, should allow him the damages, if any, that would be sustained by him in consequence of an immediate termination of the contract of employment. The closing sentence of the agreement provided that ''the arbitrators are to decide all controversies up to March 1, 1911.''

Pursuant to this agreement an award was made June 13, 1910, which allowed plaintiff seventy-five dollars for services during the month in question and $200 damages on account of the termination of the contract of employment. Both parties accepted the award and defendant gave a check to plaintiff in a sum in-

cluding the amount of the award plus $56.60 due on the old settlement and less twenty-five dollars paid to plaintiff's attorney in settlement of his fee. Afterward defendant stopped payment on the check before plaintiff could collect it but later sent the money out to a banker in Chariton county with instructions to pay it to plaintiff on his removal from the farm. Plaintiff refused to accept the money on these terms and remained on the farm until March, 1911. He did no more work for defendant under the old contracts and in June, 1911, brought this suit to enforce a claim for damages based on the alleged breach by defendant of the original contract of February 8, 1910.

The contention of plaintiff is that the two agreements for arbitration and the respective awards made under them are void for the reason that one of the arbitrators selected under the first agreement (F. H. Jones) was interested in the subject-matter of the controversy. In the first award plaintiff was allowed forty dollars "for work done on Elm creek cut-off." This cut-off was a part of the drainage system and plaintiff introduced evidence tending to show that Mr. Jones, who, as stated, owned a farm adjoining the farm of defendant, was one of the landowners at whose expense this work was being done and, therefore, was bound to contribute to the payment of the work performed by plaintiff. Mr. Jones denies this statement and says he had nothing to do with the cut-off in question. We think the evidence of plaintiff relating to this subject, though weak, is strong enough to raise an issue of fact and, therefore, in our consideration of the demurrer to the evidence, we shall assume that Mr. Jones had a pecuniary interest in one of the items submitted to him as an arbitrator. Such interest disqualified him from serving as an arbitrator and tainted the award with fraud and corruption. Being an interested party to the controversy he had no right to act as judge of his own cause and as plaintiff was ig-

norant of the fraud at the time of its perpetration he was not bound by his acceptance of the award. [Shawhan v. Baker, decided at this term, and cases cited.] "An award may undoubtedly be impeached and avoided by proof of fraud provided it be fraud practiced upon or by the referees." [Strong v. Strong, 9 Cush. 560.] And had plaintiff not ratified the award after his discovery of the fraud there can be no question that he would have been entitled to treat the whole arbitration proceeding as void and to stand on the original contract.

But we find he did ratify and adopt the award after he discovered the fraud and with full knowledge of its infirmity used it as a basis for the contract of June 13 providing for a second arbitration. In his letter of May 25 he warned defendant that the first award was subject to attack "with two parties interested as Jones and Goodman were to you." His counsel offer as an explanation of that statement that plaintiff knew Goodman was associated with defendant in the banking business and supposed that Jones sustained a similar relation towards defendant. The evidence is uncontradicted that Jones and defendant had no such business association and if plaintiff meant what his counsel say he meant, he was making a charge against Jones that had no substantial foundation and therefore was recklessly made. We find the testimony of plaintiff gives no color to this proffered explanation but on the contrary discloses that the thought in his mind when he included Jones in the charge of fraud was that Jones had a pecuniary interest in the subject-matter of the arbitration. We quote from his testimony:

"Q. At that time, you say you had no information whatever that Jones had any interest in the work that was done on the Elm creek cut-off? A. No. I didn't know that he had any interest in it at all, whatever.

"Q. And you had no information of that sort on the 13th day of June, 1910, when the second arbitration was had? A. No, sir.

"Q. Absolutely none? A. Only by hearsay.

"Q. By hearsay, did you have some information to that effect at that time? A. Not anybody that knowed positively.

"Q. You didn't have any information from Mr. Jones to that effect? A. No, not till later.

"Q. You didn't have any information from Mr. Johnston to that effect? A. No, sir.

"Q. And as a matter of fact, you have had no such information from Mr. Jones or Mr. Johnston up to this time? A. No, sir; not from either of them."

We do not give much weight to this lay classification as "hearsay" of the sources of plaintiff's information, especially in view of the fact that he used the information as the foundation of a direct and specific charge of fraud. His own testimony viewed in the light of all the circumstances of the case convinces us and leaves no room for a reasonable difference of opinion that he knew as much about the alleged interest of Jones in the subject of the arbitration when he entered into the contract of June 13 as he did when, later, he repudiated that contract. Notwithstanding the first award may have been tainted with fraud of which he was the victim, plaintiff, after the discovery of such fraud could ratify the award and treat the new contract resulting from it as valid, and, therefore, as superseding the original contract. It was optional with him to adopt or repudiate the results of his adversary's duplicity, but after making his choice with open eyes and acting on it he will not be suffered to change positions. In the contract of June 13 plaintiff voluntarily stood on the ground that the original contract had been superseded by the new contract of May 10 and agreed that the latter contract should be terminated on terms allowing him to recover the dam-

ages such premature ending would cause him. He is bound by that contract and the award made under it and cannot maintain an action founded on the original contract.

The learned trial judge permitted plaintiff to recover on the theory that the question of whether he had knowledge of the fraud in the first arbitration at the time he entered into the contract for the second involved issues of fact for the jury to determine. This, as we have shown, was an erroneous view of the evidence.

The judgment is reversed. All concur.